### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 20-417** |
| **DOMINIQUE PARKER** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by David Metcalf, United States Attorney for the Eastern District of Pennsylvania, Christopher Diviny, Ashley N. Martin, and Lauren E. Stram, Assistant United States Attorneys, hereby files its sentencing memorandum.

Defendant Dominique Parker's appalling crimes are among the worst confronted by the law. He is a career offender who engaged in a pattern of wanton violence, damaging the lives of his shooting victims, their families, and the community where he fueled the drug culture of addiction. He was a leader of a gang that ravaged the neighborhood of Frankford. He groomed young men to fortify the gang's ability to inflict violence and control his drug territory. Quite simply, he and his cohorts made citizens take their lives in their hands when they travelled in his claimed criminal enterprise territory. A serious sentence at the top of the range is required to punish the defendant for his crimes, to deter him and others from committing future crimes, and to protect society from further harm.

As set forth below, the advisory guidelines range is correctly set forth in the presentence report (PSR) as Life plus 120 months. The government requests that the Court consider the advisory guidelines and sentence the defendant to incarceration for life plus 120 months' incarceration.

## I.    PROCEDURAL BACKGROUND

On November 18, 2020, a grand jury sitting in the Eastern District of Pennsylvania returned a seven-count indictment charging co-defendants Hassan Elliott, Bilal Mitchell, Khalif Sears, and Sherman Easterling with offenses relating to a drug trafficking conspiracy and the killing of Philadelphia Police Sergeant James O'Connor, and related offenses.  Specifically, they were charged with violating 21 U.S.C. §§ 846 (conspiracy to distribute controlled substances), 841(a)(1), (b)(1)(B) (possession with intent to distribute 28 grams or more of cocaine base ("crack") and marijuana), and 856(a)(1) (maintaining a drug involved premises), and 18 U.S.C. §§ 924(c)(1)(A)(i) (possession of a firearm in furtherance of a drug trafficking crime), 924(j)(1) (murder in the course of using, carrying and discharging a firearm), and 2 (aiding and abetting) stemming from their participation in a drug trafficking conspiracy and the killing of Philadelphia Police Sergeant James O'Connor.  Defendants Elliott and Easterling were also charged with 18 U.S.C. § 922(g)(1) (possession of a firearm by a felon).

On March 22, 2023, a federal grand jury returned a 31-count superseding indictment charging Hassan Elliott, Khalif Sears, Kelvin Jiminez, and Dominique Parker with conspiracy to engage in a racketeer influenced corrupt organization ("RICO"), in violation of 18 U.S.C. § 1962(d), violent crimes in aid of racketeering ("VCAR") to include murder, in violation of 18 U.S.C. § 1959(a)(1), stemming from the killings of victims Kaseem Rogers, Tyrone Tyree, Dontae Walker, and Philadelphia Police Sergeant James O'Connor, and related offenses.  The superseding indictment included charges as follows:

| COUNT | CHARGE | STATUTE | DEFENDANTS | DATES OF OFFENSE |
|---|---|---|---|---|
| 1 | RICO Conspiracy | 18 U.S.C. § 1962(d) | All defendants | June 2017 to May 2021 |
| 2 | Drug Conspiracy | 21 U.S.C. § 846 | All defendants | June 2017 to May 2021 |
| 3 | VCAR – Murder in aid of racketeering (Kaseem Rogers) | 18 U.S.C. §§ 1959(a)(1) and 2 | Elliott Jiminez | December 3, 2018 |
| 4 | VCAR – Assault with a dangerous weapon in aid of racketeering (D.S.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott Jiminez | December 3, 2018 |

| 5 | VCAR – Assault with a dangerous weapon in aid of racketeering (J.L.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott Jiminez | December 3, 2018 |
| 6 | Causing death through the use of a firearm during and in relation to a crime of violence (Kaseem Rogers) | 18 U.S.C. §§ 924(c)(1)(A), (j)(1) and 2 | Elliott Jiminez | December 3, 2018 |
| 7 | VCAR – Assault with a dangerous weapon in aid of racketeering (C.S.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott | January 25, 2019 |
| 8 | VCAR – Assault with a dangerous weapon in aid of racketeering (M.H.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott | January 25, 2019 |
| 9 | Carrying and using a firearm during a crime of violence | 18 U.S.C. §§ 924(c) and 2 | Elliott | January 25, 2019 |
| 10 | VCAR – Murder in aid of racketeering (Tyrone Tyree) | 18 U.S.C. §§ 1959(a)(1) and 2 | Elliott | March 1, 2019 |
| 11 | Causing death through the use of a firearm during and in relation to a crime of violence (Tyrone Tyree) | 18 U.S.C. §§ 924(c)(1)(A), (j)(1) and 2 | Elliott | March 1, 2019 |
| 12 | VCAR – Assault with a dangerous weapon in aid of racketeering (R.B.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott Jiminez Parker | August 20, 2019 |
| 13 | Carrying and using a firearm during a crime of violence | 18 U.S.C. §§ 924(c) and 2 | Elliott Jiminez Parker | August 20, 2019 |
| 14 | VCAR – Murder in aid of racketeering (Dontae Walker) | 18 U.S.C. §§ 1959(a)(1) and 2 | Elliott Parker | August 22, 2019 |
| 15 | VCAR – Assault with a dangerous weapon in aid of racketeering (U.W.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott Parker | August 22, 2019 |
| 16 | Causing death through the use of a firearm during and in relation to a crime of violence (Dontae Walker) | 18 U.S.C. §§ 924(c)(1)(A), (j)(1) and 2 | Elliott Parker | August 22, 2019 |
| 17 | VCAR – Assault with a dangerous weapon in | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott Sears Jiminez | December 20, 2019 |

| | | | | |
|---|---|---|---|---|
| | aid of racketeering (R.F.) | | | |
| 18 | Carrying and using a firearm during a crime of violence | 18 U.S.C. §§ 924(c) and 2 | Elliott Sears Jiminez | December 20, 2019 |
| 19 | VCAR – Attempted assault with a dangerous weapon in aid of racketeering (L.H.) | 18 U.S.C. §§ 1959(a)(6) and 2 | Elliott | December 27, 2019 |
| 20 | VCAR – Assault with a dangerous weapon in aid of racketeering (R.R.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott | December 27, 2019 |
| 21 | Carrying and using a firearm during a crime of violence | 18 U.S.C. §§ 924(c) and 2 | Elliott | December 27, 2019 |
| 22 | VCAR – Assault with a dangerous weapon in aid of racketeering (M.M.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott Sears Jiminez | January 28, 2020 |
| 23 | Carrying and using a firearm during a crime of violence | 18 U.S.C. §§ 924(c) and 2 | Elliott Sears Jiminez | January 28, 2020 |
| 24 | Possession with intent to distribute cocaine and marijuana | 21 U.S.C. § 841(a) | Elliott Sears | March 13, 2020 |
| 25 | Possession of a firearm in furtherance of a drug trafficking crime | 18 U.S.C. §§ 924(c) and 2 | Elliott Sears | March 13, 2020 |
| 26 | VCAR – Murder in aid of racketeering (James O'Connor) | 18 U.S.C. §§ 1959(a)(1) and 2 | Elliott Sears | March 13, 2020 |
| 27 | Causing death through the use of a firearm during and in relation to a drug trafficking crime (James O'Connor) | 18 U.S.C. §§ 924(c)(1)(A), (j)(1) and 2 | Elliott Sears | March 13, 2020 |
| 28 | Possession of a firearm by a felon | 18 U.S.C. § 922(g) | Elliott | March 13, 2020 |
| 29 | Maintaining a drug-involved premises | 21 U.S.C. § 856(a)(1) | All defendants | March 13, 2020 |
| 30 | VCAR – Attempted assault with a dangerous weapon in aid of racketeering (B.L.) | 18 U.S.C. §§ 1959(a)(6) and 2 | Parker | May 22, 2021 |
| 31 | Possession of a firearm by a felon | 18 U.S.C. § 922(g) | Parker | May 22, 2021 |

From February 24 through March 25, 2025, the defendant was tried along with his codefendant, Kelvin Jimenez, and convicted of Counts 1, 2, 12-16, and 29-31, all the counts with which he was charged, by a jury of his peers. On December 25, 2025, this Court denied defendant's motion for a judgement of acquittal pursuant to Fed. R. Crim. P. 29 and a new trial pursuant to Fed. R. Crim. P. 33 and scheduled the case for sentencing.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

## II.   FACTS PRESENTED AT TRIAL

### A.  The RICO Conspiracy, Drug Dealing Conspiracy, and Maintaining a Drug-Involved Premises (Counts 1-2, and 29)

The defendant was a central member of a violent drug trafficking organization that operated out of the Frankford section of Philadelphia. The enterprise, "1700 Scattergood/SG1700" and "5300 Lesher/L-Block" (hereinafter referred to as "SG1700"), was an association in-fact and was a wide-ranging drug trafficking organization. The defendants and others in the gang trafficked more than five kilograms of cocaine which they processed into cocaine base ("crack").  The gang further constituted a racketeering enterprise and committed violent acts including murders in furtherance of their enterprise. The gang members and associates sold wholesale and retail quantities of "crack" cocaine and marijuana and defended their drug distribution interests with violence and threats of violence.

Members of the organization proved their loyalty to the gang by progressively selling larger quantities of controlled substances for the organization, committing violent acts against opposing drug gangs (like the Tackawanna Projects or Hawthorne Street gangs), and refusing to cooperate with law enforcement if arrested (e.g., not "ratting"). Members of the gang committed a number of homicides and shootings in the name of the organization to protect the enterprise's reputation and territory, including the murders of Kaseem Rogers (a/k/a "Glizzy"), Tyrone Tyree, Dontae Walker (a/k/a "Mugga"), and Sergeant James O'Connor. The gang's reputation for violence was an integral part of the success of the enterprise. The gang's territory abuts Frankford Avenue, a heavily trafficked thoroughfare in the Frankford section of Northeast

Philadelphia. Members of the gang often sold narcotics on Frankford Avenue but also allowed associates to sell along Frankford Avenue as long as there was enough business to go around. The members of the gang had a right of first refusal to drug buyers. Associates chose to affiliate with the gang, purchase drugs from them, and sell in areas controlled by the gang because the gang's reputation itself protected them from being robbed by rival dealers. Moreover, if the gang did not enjoy a reputation for violence, it could not maintain its own ability to sell drugs along this highly coveted thoroughfare.

To maintain their reputation for violence, the gang routinely traveled to the Tackawanna Projects and the area of Hawthorne and Marlowe Streets, nearby territories controlled by opposition gangs, to shoot rival gang members. This was done to show their willingness to kill or engage in violence to protect their drug area and retaliate against any threats, perceived or actual, from other gangs.

The defendants used social media to demonstrate their affiliation with SG1700, display access to firearms, celebrate the gang's success, and intimidate witnesses and rivals. The group created numerous music videos and rap songs which they distributed on social media and YouTube. The government introduced many social media posts from SG1700 members and rap videos showing how defendant Parker and the group used social media in this way.

The gang members rented from a crack cocaine addicted customer, the second floor middle room of 1688 Bridge Street. They used this space to secure, package, and sell their drugs. They also used the room to store their communal arsenal of firearms and provide a hideout for members evading police. It is from this room that Hassan Elliott fired multiple shots murdering Sergeant James O'Connor on March13, 2020.

### A. Shooting of R.B. (Counts 12 and 13)

Members of the SG1700 routinely traveled to the Tackawanna Projects—a territory controlled by a nearby opposition group—to shoot rival gang members. This was done to show their willingness to kill or engage in violence to protect their drug area and retaliate against any threats, perceived or actual, from other groups. In the event the group did not encounter any known opposition members, the group sent a message to the opposition by shooting anyone present in the opposition territory, even those unaffiliated with the opposition, to communicate to the opposition that the group was looking for them and as proof that they had crossed enemy lines. This was the case when, in the early morning hours of August 20, 2019, SG1700 members received word that opposition gang members were standing on a corner within the Tackawanna Housing Projects and decided to go to the area to shoot them. As Bilal Mitchell and Kelvin Jimenez attempted to get a car to use during the shooting, Elliott and Dominique Parker armed themselves and rode bicycles to the location. When Elliott and Parker arrived on the 1800 block of Fillmore Street, they saw R.B. sitting on his porch and both began shooting, hitting R.B. ten times throughout his body. After the shooting, they believed they had murdered R.B. but he survived with extraordinary medical intervention. Mitchell took the guns used during the shooting from Elliott and Parker and returned them to 1688 Bridge Street, a property used by SG1700 members to package controlled substances and store firearms.

### B. Murder of Dontae Walker and Shooting at U.W. (Counts 14-16)

Dontae Walker was murdered on August 22, 2019, by SG1700 members in retaliation for the shooting of a 5300 Lesher/SG1700 member on August 17, 2019. The organization was unsure which opposition group was responsible for the shooting, so they retaliated against both of their main opposition groups. One of these groups was the Hawthorne Street gang. On the day

of the murder, Elliott, Bilal Mitchell, Dominique Parker, and M.B., all SG1700 members, agreed to shoot members of the Hawthorne Street gang who were on a nearby porch on Marlowe Street. Using the neighborhood alleys, Mitchell and Elliott approached the targeted location from one direction and M.B. and Parker approached from another. They converged on the corner of Hawthorne and Bridge Streets, where they saw Walker sweeping the sidewalk near a barber's chair. The men opened fire on Walker who tried to run away from his attackers but was boxed in. Also, an innocent bystander, U.W., was trapped in the hail of bullets. Walker suffered multiple gunshots, resulting in his death.

### C. Attempted Shooting of B.L. by Convicted Felon Parker (Counts 30 and 31)

On May 22, 2021, B.L.—a rival gang member, part of the Hawthorne Street gang —shot and killed SG1700 member L.H. in SG1700 territory at the intersection of Frankford Avenue and Granite Street, as he walked alongside fellow SG1700 member, Parker. After B.L. opened fire and shot L.H., Parker darted from the line of fire, retrieved a firearm from his waistband, and returned fire. Parker, a convicted felon, shot at B.L. multiple times and continued firing even as B.L. ran away.

### Sentencing Calculation

### A.     Statutory Maximum Sentence

The defendant could be sentenced to the following statutory maximum sentences: Count 1 (conspiracy to participate in a racketeering ("RICO") enterprise), lifetime imprisonment, 5 years' supervised release, a $250,000 fine, and a $100 special assessment; Count 2 (conspiracy to distribute cocaine and marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C)), 20 years' imprisonment, a mandatory minimum 3 years' supervised release up to lifetime supervised release, a $1,000,000 fine, and a $100 special assessment; Counts 12 and 15 (assault

with a dangerous weapon in aid of racketeering, and aiding and abetting), 20 years' imprisonment, 5 years' supervised release, a $250,000 fine, and a $100 special assessment; Count 13 (carrying and using a firearm in furtherance of a violent crime, and aiding and abetting), lifetime imprisonment, a 10-year mandatory minimum term of imprisonment which must be imposed consecutive to any other sentence of imprisonment imposed, 5 years' supervised release, a $250,000 fine, and a $100 special assessment; Count 14 (murder in aid of racketeering, and aiding and abetting), mandatory life imprisonment, 5 years' supervised release, a $250,000 fine, and a $100 special assessment; Count 16 (causing death using a firearm during and in relation to a violent crime or a drug trafficking crime, and aiding and abetting), lifetime imprisonment, 5 years' supervised release, a $250,000 fine, and a $100 special assessment; Count 29 (maintaining a drug involved premises), 20 years' imprisonment, 3 years' supervised release, a $500,000 fine, and a $100 special assessment; Count 30 (attempted assault with a dangerous weapon in aid of racketeering, and aiding and abetting), 3 years' imprisonment, 1 year supervised release, a $250,000 fine, and a $100 special assessment; and Count 31 (possession of a firearm by a felon), 10 years' imprisonment, 3 years' supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum and Mandatory Minimum Sentence: is a mandatory minimum of life imprisonment plus 120 months imprisonment which is to run consecutive to any other sentence imposed, a 5-year period of supervised release up to a lifetime of supervised release, an $3,500,000 fine, and a $1,000 special assessment. Forfeiture of any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offenses, and any property constituting, derived from, or proceeds obtained directly or indirectly from the commission of such offenses also may be ordered.

**B.      Sentencing Guidelines Calculation**

The defendant's advisory guideline range is correctly set forth in the PSR as follows: The offense level for the defendant's most serious crime, the murder of Dontae Walker, is 43, which is increased to 44 because of grouping under the guidelines. The total offense level is, therefore, 44, but pursuant to Chapter 5, Part A (comment n.2), a score above 43 is converted to 43 – the highest score contemplated under the guidelines. The defendant has ten criminal history points, placing him in criminal history category V, but he is a career offender, so his criminal history category is increased to VI, pursuant to U.S.S.G. § 4B1.1. The guideline range is Life, plus 120 months' imprisonment. The 120 months added to the life sentence results from the consecutive term of 120 months on Count 13. *See* PSR, ¶ 265.

<u>**Analysis of Sentencing Factors**</u>

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) indicates that the Court should accept the calculation of the advisory guidelines as set forth above, review all other factors, and impose a sentence of life plus 120 months' incarceration.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing factors set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness

of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

A.    The nature and circumstances of the offense and the history and characteristics of the defendant.

1.    The nature and circumstances of the offense

The defendant's murders, assaults, drug dealing, and related gang crimes represent the most serious criminal behavior which our laws must address. The defendant showed a callous disregard for the laws of society and the value of human life. He caused irreparable and devastating harm to the families of his murder victims, his shooting victims, and his community. He terrorized his neighborhood with his unrelenting criminal behavior and left a wake of permanent victimization. Nobody is entitled to inflict such mayhem.

The victim impact statements outlined in the PSR detail the horrific trauma the victims and families of murder victims have experienced at the hands of the defendant and his cohorts. *See* PSR, ¶¶ 118-144. There can be no doubt that their lives were forever altered due to his

blatant disregard for his fellow human beings and the community. His offenses are the most serious under the law and warrant significant punishment.

      2.      The history and characteristics of the defendant

The defendant is a 35-year-old man, born on April 7, 1991, who resided in Philadelphia. He has no work history to speak of. Rather, he spent his life engaging in criminal behavior. The defendant was incarcerated in the past in state prison and spent other periods under court supervision, all with no apparent corrective effect.

B.      The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

A sentence of life imprisonment plus 120 months appropriately reflects the seriousness of the defendant's violent criminal behavior. It also sends a message to deter others who might engage in similar conduct. It is difficult to overstate the seriousness of the defendant's offenses, taking and impacting so many lives. The offenses here are serious ones, and the punishment must also be serious.

C.      The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.

The need for adequate deterrence of this type of crime is great. Given the prevalence of gun violence and drug dealing in Philadelphia, the need to deter others—and the defendant— from similar crimes is especially important. The importance is even greater when considering that the defendant armed himself with numerous firearms to commit his multiple crimes, including large capacity firearms and those with extended magazines. The need to deter this defendant is especially great. The defendant's continuing interactions with the criminal justice

system have not deterred him. Accordingly, a lengthy period of incarceration must be imposed to ensure this defendant does not reoffend. Such a sentence would not only deter this defendant but would protect the public from additional crimes by the defendant for at least as long as he remains in prison. This type of criminal behavior is devastating to the Philadelphia community that is inundated with illegal drugs and gun violence. Those who are inclined to engage in such crimes must be deterred by the possibility of receiving a serious sentence.

D.      The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.

There is no demonstrated need to adjust the sentence in order to provide the defendant with needed educational or vocational training, medical care, or additional treatment that cannot be adequately addressed by the Bureau of Prisons during incarceration. Should the defendant desire to avail himself of opportunities for education, treatment, or training, the recommended sentence will not inhibit those efforts while in custody or on supervised release.

E.      The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

While the Sentencing Guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the Guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. The Third Circuit explained:

Even under the current advisory system, district courts must "meaningfully consider" § 3553(a)(4), i.e., "the applicable category of offense . . . as set forth in the guidelines." The section of *Booker* that makes the Guidelines advisory explains that "the remaining system, while not the system Congress enacted, nonetheless continue[s] to move sentencing in Congress' preferred direction, *helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary*." *Booker*, 543 U.S. at 264-65 (emphasis added). The Guidelines remain at the center of this effort to "avoid excessive sentencing disparities," and, as the *Booker* Court explained, the Sentencing Commission will continue "to promote uniformity in the sentencing process" through the Guidelines. *Id*. at 263. We have likewise observed that the "'Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.'" *Cooper*, 437 F.3d at 331 (quoting *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005)).

*United States v. Ricks*, 494 F.3d 394, 400 (3d Cir. 2007) (emphasis in original). Therefore, the Supreme Court has held that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process" in order to assure fair, proportionate, and uniform sentencing of criminal offenders. *Gall*, 552 U.S. at 50 n.6.

As Congress has codified, it is part of our sense of justice that similarly situated defendants should be given similar sentences. The Sentencing Guidelines provide a recommended sentencing range so that similarly situated defendants receive similar punishment. The government asserts that the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors supports the sentence consistent with the guidelines and mandatory minimum sentencing provisions, of life plus 120 months incarceration.

F.    The need to provide restitution to victims.

Pursuant to the Crime Victims' Rights Act, a crime victim has the right to "full and timely restitution as provided by law." *See* 18 U.S.C. § 3771(a)(6). In cases where, as here, the victims suffered bodily injury, restitution statutes authorize restitution for an amount equal to the

cost of necessary medical and related services, psychological care, non-medical care and treatment, therapy, and lost income. 18 U.S.C. § 3663(b)(2). The government requests that the Court order restitution for the victims' losses.

### Conclusion

The defendant committed incredibly serious crimes. For all the reasons set forth above, this Court should impose a sentence consistent with the guidelines and mandatory minimum sentencing provisions, of life plus 120 months incarceration.

Respectfully submitted,
DAVID METCALF

/s Christopher Diviny_____
CHRISTOPHER DIVINY
ASHLEY N. MARTIN
LAUREN E. STRAM
Assistant United States Attorneys

- 17 -

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that I caused a copy of the Government's Sentencing Memorandum has been e-filed and thereby served upon the following:

John A. DiSantis, Esq.
18 South New Street
West Chester, PA 19382
johndisantis@aol.com

/s Christopher Diviny_____
CHRISTOPHER DIVINY
ASHLEY N. MARTIN
LAUREN E. STRAM
Assistant United States Attorneys

Dated: August 11, 2026